# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7466 | **DATE** | 2/27/2001 |
| **CASE TITLE** | Nancy Flodine d/b/a Natural Wonders vs. State Farm Insurance Co., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3/15/01 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Judgment on the Pleadings [13] is denied. Plaintiff's Cross-Motion for Judgment on the Pleadings [27] is granted. A status hearing is set for 3/15/01 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | Document Number |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| ✓ | Notified counsel by telephone. | | MAR 0 1 2001 | | 3³ |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NANCY FLODINE d/b/a NATURAL　　　）
WONDERS,　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　Plaintiff,　　　）　　No. 99 C 7466
　　　　v.　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）　　Judge Joan B. Gottschall
STATE FARM INSURANCE CO., et al.,　）
　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　Defendants.　　）

## MEMORANDUM OPINION AND ORDER

Plaintiff Nancy Flodine (Flodine), who manufactures and sells "Southwestern-style" arts and crafts under the business name Natural Wonders, asked her business liability insurer, defendant State Farm Fire and Casualty Company (State Farm) to defend her in a lawsuit brought against her by J.C. Penney Company (Penney). When State Farm refused, Flodine filed this declaratory judgment action seeking a determination that her insurance policy covered Penney's suit against her and that State Farm owed her duties of defense and indemnity with respect to the Penney litigation.

### Background

The declarations of policy number 96-17-8364-4 reflect that it was issued to Nancy Flodine d/b/a Natural Wonders in Harlingen, Texas, by State Farm's Greeley, Colorado, division. See Def.'s Answer and Affirmative Defenses to Compl. For Decl. J., Ex. A. The policy listed the named insured as "individual." Id. Section I of the policy covered losses to business personal property located at an address in Boulder, Colorado, but did not include coverage for the building

1

33

itself. Id. Section II of the policy provided comprehensive business liability coverage for sums that Flodine becomes obligated to pay "as damages because of bodily injury, property damage, personal injury or advertising injury" to which the insurance applied, noting that it applied only to "advertising injury caused by an occurrence committed in the coverage territory during the policy period." Id. at 20. "Coverage territory" included the United States, Puerto Rico and Canada. Id. at 30. The policy provided that the "occurrence" (defined as "the commission of an offense, or a series of similar or related offenses, which results in personal injury or advertising injury") causing advertising injury "must be committed in the course of advertising your goods, products, or services."

According to the policy definitions, "advertising injury" means

injury arising out of one or more of the following offenses:

> a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> b. oral or written publication of material that violates a person's right of privacy;
>
> c. misappropriation of advertising ideas or style of doing business; or
>
> d. infringement of copyright, title or slogan

Policy at 30.

In addition, the policy excluded the following types of personal and advertising injury from coverage:

> a. arising out of oral or written publication of material if done by or at the direction of the insured with knowledge of its falsity;

2

b. arising out of oral or written publication of material whose first publication took place before the beginning of the policy;

c. arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

d. for which the insured has assumed liability in a contract or agreement. This part of the exclusion does not apply to liability for damages that the insured would have in the absence of a contract or agreement.

See Policy at 24 (Business Liability Exclusion 16). Another provision excluded coverage for advertising injury arising out of:

a. breach of contract other than misappropriation of advertising ideas under an implied contract;

b. the failure of goods, products or services to conform with advertised quality or performance;

c. the wrong description of the price of goods, products or services; or

d. an offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

Policy at 24 (Business Liability Exclusion 17).

The policy stated that State Farm "will have the right and duty to defend any claim or suit seeking damages payable under this policy even though the allegations of the suit may be groundless, false or fraudulent." Id. at 20.

Native American Arts (NAA), an "Indian[1] arts and crafts organization," and the Ho-Chunk Nation (Ho-Chunk), an Indian tribe recognized by the United States government, brought an action against Penney alleging that Penney's sale of "Southwestern-style" arts and crafts at its northern Illinois stores violated the Indian Arts and Crafts Act of 1990 (IACA), 25 U.S.C. § 305

---

[1] The court uses this statutory terminology in the interest of consistency.

*et. seq.*, which prohibits the offer, display for sale, or sale of any good "in a manner that falsely suggests it is Indian produced. . . ." 25 U.S.C. § 305e(a). <u>See Ho-Chunk Nation, et. al. v. J.C. Penney Co.</u>, No. 98 C 3924 (N.D. Ill.). Ho-Chunk and NAA also alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), 815 ILCS 505/2, and the Illinois Deceptive Trade Practices Act (Deceptive Trade Practices Act), 815 ILCS 510/2. Penney, in turn, sued Flodine and other arts and crafts suppliers as third-party defendants. In Penney's Second Amended Third-Party Complaint (SATPC), Penney alleged that Flodine and other suppliers breached Penney's Wholesale Contract and Listing Sheet agreement and the implied warranty of merchantability, 810 ILCS 5/2-314, as well as violated the Consumer Fraud Act, by misrepresenting the origin and nature of their goods and representing that the goods complied with all applicable laws.

In addition to its direct claims against Flodine and other arts and crafts suppliers, Penney sought contribution from them in its SATPC for any liability Penney incurred to Ho-Chunk/NAA on the underlying complaint. In that complaint, Ho-Chunk and NAA claimed that Penney's advertising, marketing, display, offer for sale, and sale in its stores and catalogue of "Southwestern-style" arts and crafts products, including those made by Flodine, violated the IACA by falsely suggesting "that they are authentic Indian products made by a Native American." <u>See</u> Ho-Chunk/NAA Compl. ¶¶ 9-42; ¶ 51; Am. Compl. ¶¶ 2-10. Ho-Chunk and NAA included exhibits with their complaint and amended complaint that depicted a sample of the offending goods and the tags attached to the goods. Many of the tags contained the words "Indian" or "Native American," the names of specific Indian tribes, and/or traditional Indian-style artwork and drawings. <u>See</u> Ho-Chunk/NAA Compl. Exs. A through II; Am. Compl. Exs.

4

A-1 through N-1. Ho-Chunk and NAA alleged that the products' tags falsely stated or created the impression that the products were Indian-made, and that some products lacked any tag to distinguish them from authentic Indian-made products. See, e.g., Ho-Chunk/NAA Compl. ¶¶ 5, 44-55. The injury sustained by Ho-Chunk and NAA as a result of the alleged violation consisted of consumer confusion and the loss of sales of their authentic Indian-made products to consumers who were persuaded to buy and wished to purchase authentic goods but were tricked into buying the counterfeits. Ho-Chunk and NAA also brought statutory unfair competition claims against Penney, alleging that Penney's activities injured them in both their capacity as sellers of competing goods and as purchasers of the goods from Penney.

In its SATPC, Penney pointed to Ho-Chunk and NAA's allegations regarding "descriptive tags, no attached tags, unreadable tags or damaged tags" accompanying goods supplied by Flodine and the other producers that "misrepresent the origin and/or nature of the goods and falsely suggest that they were produced by North American Indians." SATPC ¶¶ 14-15. Noting that it had denied that the tags misrepresented such facts, Penney further stated that it played no role in creating, selecting text or drawings for, designing, manufacturing, deciding to attach, attaching, altering, or modifying the tags or goods at issue, nor did it know whether the tags' representations were true or false. ¶¶ 15-17. "On information and belief," Penney alleged that the suppliers of the goods in question determined whether to attach tags to the goods and that the supplier and outside vendor representative (who purchased the goods for Penney) knew the origin and producer of the goods, attached tags to the goods, and played a role in selecting the text or drawings included on tags attached to the goods. ¶¶ 18-19. Count XXI of Penney's SATPC, labeled "Contribution-Natural Wonders," denied that Penney violated any law or

breached any duty to Ho-Chunk and NAA, but stated that if the court found it violated the IACA, Consumer Fraud Act, and/or the Deceptive Trade Practices Act, as alleged by Ho-Chunk/NAA, then Natural Wonders (Flodine) "is liable to J.C. Penney for all or part of [Ho-Chunk and NAA]'s claim against" Penney. ¶ 127.

In Count XXII of the SATPC, Penney alleged that Flodine misrepresented that her goods complied with all federal regulations, including the IACA, and as a result

> is guilty of "passing off" the goods in question, has created confusion as to the goods' source and their producers' association with a Native American Indian Tribe within the meaning of Sections 2(I)-(5) of the Uniform Deceptive Trade Practices Act, which definitions are incorporated into the Illinois Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.
> ¶ 130.

Penney further asserted that Flodine fraudulently misrepresented the origin of her goods with the purpose of 1) inducing Penney to rely on the deception so that it would purchase her goods, 2) inducing Penney's "unwitting deceptive resale" of her goods to "the consuming public," and 3) inducing the consuming public to believe her goods were authentic Indian arts and crafts. ¶ 131. Penney alleged that it was entitled to believe that Flodine's goods complied with all federal regulations (including the IACA) and that it would not have purchased or re-sold the goods if it had known they violated the IACA. ¶¶ 132-33. Finally, Penney claimed that Flodine's conduct had damaged it and that it was entitled to a remedy as a consumer under the Consumer Fraud Act. ¶¶ 129, 134.

Count XXIII (Breach of Contract-Natural Wonders) of the SATPC alleged that Natural Wonders (Flodine) made oral representations regarding the nature and origin of her goods to Penney before it purchased the goods, which, along with the descriptive tags attached to the

goods, constituted promises to deliver goods in conformance with those representations. ¶ 136. In addition, Flodine/Natural Wonders accepted Penney's purchase order to supply goods to Penney. ¶ 137. This included a Wholesale Contract and Listing Sheet agreement, in which the seller

> represents and warrants to Penney, in addition to all warranties implied by law, that each item of merchandise described on the face hereof, whether produced in whole or in part by Seller or a third party, together with all related packaging, labeling and other printed matter and all related advertisements furnished or authorized by Seller ("Merchandise") shall.....(b) be fit for its particular purpose and be suitable for use, be manufactured, be packaged for shipment, be properly labeled, including marked with the country of origin, where applicable, and be registered as required, all in accordance with and under all applicable laws, ordinances, regulations, rulings, orders, decrees, resolutions, norms, standards, requirements, policies, or directives of any governmental authority of or within the United States of America,....the countr(ies) of origin...; (c) not infringe or encroach upon any third party's personal, contractual or proprietary rights, including patents, trademarks, trade names, copyrights, rights of privacy, rights of publicity, or trade secrets granted or recognized under the laws of the United States....; (f) possesses all performance qualities and characteristics claimed in advertisements or printed materials issued or authorized by Seller... SATPC ¶ 138.

Penney claimed that Flodine breached their agreement because her goods violated the IACA, that it did not know of the violation, and that it suffered damage as a result. ¶¶ 139-40.

Penney also alleged that if the court were to find Flodine's goods violated the IACA, then Flodine breached an implied warranty of merchantability owed to Penney under 810 ILCS 5/2-314, with resulting damage to Penney. ¶¶ 142-46.

Flodine tendered Penney's SATPC to State Farm, which refused to defend her on the grounds that the suit did not involve "advertising injury" as defined in the insurance agreement. On July 2, 1999, the court dismissed Penney's claim that the third-party defendant suppliers violated the Consumer Fraud Act and Penney's claim for contribution under the IACA. Flodine

filed the instant action against State Farm on November 16, 1999.  State Farm moved for judgment on the pleadings, arguing that the underlying lawsuit does not allege advertising injury or injury committed "in the course of advertising," as required for coverage under the policy terms.  State Farm also contended that certain policy exclusions bar coverage of any advertising injury that may have occurred.  Flodine, joined by NAA (to whom she assigned her right to any insurance proceeds arising from the underlying suit) filed a cross motion for judgment on the pleadings.

Discussion

## I.  Choice of Law

The insurance contract does not contain a choice-of-law provision.  State Farm argues that the law of Colorado should govern this dispute, while Flodine contends that Illinois law should apply.  If there is a conflict between the laws potentially applicable to an action premised upon diversity of citizenship, federal district courts apply the choice-of-law principles of the forum state in determining which state's substantive law to apply.  Jupiter Aluminum Corp. v. Home Ins. Co., 225 F.3d 868, 873 (7th Cir. 2000).  Under Illinois choice-of-law rules, when the parties did not designate a choice of law in their contract, "insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.'" Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co., 655 N.E.2d 842, 845 (Ill. 1995) (quoting Hofeld v. Nationwide Life Ins. Co., 322 N.E.2d 454 (Ill. 1975)). The choice of law is made separately for each issue.  Vantassell-Matin v. Nelson, 741 F. Supp. 698, 702-3 (N.D. Ill. 1990)

8

(quoting <u>In re Air Crash Disaster Near Chicago, Illinois</u>, 644 F.2d 594, 611 & n.13 (7th Cir. 1981)); <u>Int'l Adm'rs, Inc. v. Life Ins. Co. of N. Am.</u>, 753 F.2d 1373, 1376 n. 4 (7th Cir, 1985).

However, before the court engages in choice-of-law analysis, it should determine whether application of the relevant laws would produce different results. <u>See</u> <u>Jean v. Dugan</u>, 20 F.3d 255, 260 (7th Cir. 1994) (quoting <u>Barron v. Ford Motor Co.</u>, 965 F.2d 195, 197 (7th Cir. 1992)). "When there is no disagreement among the contact states, the law of the forum state applies." <u>Id.</u> (citing <u>Int'l Adm'rs, supra</u>, 753 F.2d at 1376 n. 4). In contending that Colorado law applies to this case, State Farm has not argued that Colorado law differs from the law of Illinois applicable to this motion or otherwise demonstrated a conflict necessitating a choice of law. Flodine concedes that applying Colorado or Illinois law would yield the same result on this motion, regarding State Farm's duty to defend.[2] A review of Colorado law reveals that its treatment of an insurer's duty to defend is the same as that of Illinois law, so there is no conflict of law on that issue. <u>See</u> discussion of duty to defend, <u>infra</u>. In addition, neither state's case law clearly answers the questions posed by the pending motions: no Colorado or Illinois court has addressed whether a general commercial liability policy covers IACA violations, and few cases have

---

[2] Flodine asserts that the choice of law will become important if the court finds State Farm breached its duty to defend, because Illinois law prevents an insurer that breaches its duty to defend from asserting coverage defenses, whereas Colorado law may not. However, that issue is not implicated in the decision of the parties' current motions, which concern the duty to defend and do not fully address issues of indemnification. The question of the extent, if any, of State Farm's duty to indemnify Flodine can be addressed only after it has been determined to have a duty to defend her in the underlying case.

In addressing the <u>Lapham-Hickey</u> factors, the parties focused unduly on the location of the insured risk and failed to provide much information about the remaining factors. The insured risk at issue in this case was of advertising injury, which, unless evidence shows that Flodine's advertising and promotional activities were confined primarily to a single state, cannot be so located. The insured risk is not the facility in Colorado or the place where liability actually arose. If the choice of law were to become important at a later stage in the case, the court would recommend that the remaining Lapham-Hickey factors be re-visited.

discussed the extent of coverage for intellectual property torts or the definition of "advertising" or "advertising injury." See discussion below. Courts may look to the law of other jurisdictions when a state's supreme court is silent on an issue. See Erie Ins. Group v. Sear Corp., 102 F.3d 889, 892 (7th Cir. 1996). No matter what law the court applies, it will be necessary to seek guidance from authorities of other jurisdictions because the motions present new applications of law that are not well developed. Therefore, the court need not conduct a choice-of-law analysis at this juncture.

## II. Duty to Defend

Determining whether coverage exists under an insurance policy involves contract interpretation, a question of law that is appropriate for summary judgment. Crum & Forster Managers Corp. et. al. v. Resolution Trust Corp., 620 N.E.2d 1073, 1077 (Ill. 1993); Compass Ins. Co. v. City of Littleton, 984 P.2d 606, 613 (Colo. 1999) (en banc). Words in an insurance policy will be given their plain and ordinary meaning in the context of the agreement as a whole, and courts should not rewrite clear and unambiguous provisions. Id. at 1078; 613. However, when a provision in an insurance contract is susceptible of more than one reasonable interpretation, courts in both Illinois and Colorado construe it against the drafter and in favor of the insured. U. S. Fid. & Guar. Co. v. Wilkin Insulation Co., 578 N.E.2d 926, 930 (Ill. 1991); Compass Ins. Co., 984 P.2d at 613.

An insurer's duty to defend its insured in a lawsuit filed against the insured is broader than its duty to indemnify; in some cases the duty to defend may arise though the insurer is not ultimately found liable to indemnify the insured. Crum & Forster, 620 N.E.2d at 1079; Compass Ins. Co., 984 P.2d at 613. To determine whether an insurer has a duty to defend, courts compare

the allegations of the underlying complaint with the relevant coverage provisions of the policy. Id. If the facts alleged in the underlying complaint fall within, or potentially within, the coverage provisions, then the insurer must defend the insured in the underlying action. Id. at 1079; 613-614; see William J. Templeman Co. v. Liberty Mut. Ins. Co., 735 N.E.2d 669, 676 (Ill. App. Ct. 2000). The allegations of the underlying complaint must be construed liberally, and any doubt as to coverage must be resolved in favor of the insured. Illinois State Med. Ins. Servs., Inc. v. Cichon, 629 N.E.2d 822, 826 (Ill. App. Ct. 1994); Compass Ins. Co., 984 P.2d at 613-14 (discussing "heavy burden" borne by insurer seeking to avoid duty to defend under Colorado law). The duty to defend extends to cases where the complaint contains several theories or causes of action against the insured and only one of the theories is within the policy's coverage. Int'l Ins. Co. v. Rollprint Packaging Prods., Inc., 728 N.E.2d 680, 692 (Ill. App. Ct. 2000); Fire Ins. Exch. v. Bentley, 953 P.2d 1297, 1300 (Colo. Ct. App. 1998).

III. Coverage provisions

State Farm contends that it owes Flodine no duty of defense (and likewise, indemnity) with respect to the Penney litigation because the underlying complaint, including direct claims (breach of contract and the implied warranty of merchantability and violation of the Consumer Fraud Act) and contribution claims arising from the Ho-Chunk/NAA claims against Penney (violation of the IACA, Consumer Fraud Act, and Deceptive Trade Practices Act), fails to allege "misappropriation of advertising ideas or style of doing business" and/or "infringement of copyright, title or slogan" committed in the course of advertising Flodine's products.

The crux of Penny's contribution allegations is that Flodine is jointly responsible with Penney if the court holds Penney liable to Ho-Chunk and NAA for IACA, Consumer Fraud Act,

11

and Deceptive Trade Practices Act violations.  See Bailey v. Edward Hines Lumber Co., 719 N.E.2d 178, 180 (Ill. App. Ct. 1999) (basis for a third-party defendant's obligation to contribute is its liability to the original plaintiff); see also Black's Law Dictionary (7th ed. 1999) (defining contribution as "the right to demand that another who is jointly responsible for a third party's injury supply part of what is required to compensate the third party").  In essence, the claim seeks to hold Flodine responsible for any injury alleged by Ho-Chunk and NAA, because Flodine 1) used tags that misrepresented the origin and nature of her goods with words or drawings that conveyed to Penney and the public the message that her products were authentic, Indian-made goods; and 2) caused Penney to purchase, promote, and re-sell the goods by making false representations to Penney, both orally and in the product tags.

Flodine argues (correctly in this court's judgment) that the claims in the underlying complaint are analogous to claims for trademark or trade dress infringement.  The IACA protects Indian sellers of arts and crafts by preventing non-Indians from exploiting the market value and goodwill associated with authentic, Indian-made products; this also benefits consumers who prefer authentic goods and are willing to pay more for them.  Not only do violators of the IACA trade upon a reputation or advantage that they did not earn, but they take sales away from those who may rightfully capitalize on the fact that a product is Indian-made.  As Judge Manning observed in a case similar to the underlying Ho-Chunk/Penney action, the IACA's "falsely suggests" clause "was intended to be construed as parallel and analogous to the Lanham Act, 15 U.S.C. § 1125, which 'prohibits any person from affixing, applying, annexing, or using words or other symbols which tend falsely to describe or represent a false designation or [sic] origin.'" Native Am. Arts, Inc., et. al. v. Vill. Originals, Inc., 25 F. Supp.2d 876, 881 (N.D. Ill. 1998)

(citing H.R. Rep. No. 101-400(I) at 11, 1990 U.S.C.C.A.N. 6390, and Zeller v. LaHood, 627 F. Supp. 55 (C.D. Ill. 1985)).

The parties did not cite and this court's research did not reveal any opinion deciding whether IACA allegations fall within "advertising injury" coverage. Many courts have construed the terms "misappropriation of advertising idea" and "misappropriation of the style of doing business" to mean, generally, a wrongful taking of the way another promotes its business, and have included "passing off" and trademark and trade dress infringement allegations within this definition of "advertising injury." See 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 129:28 (3d ed. Supp. Dec. 2000); Union Ins. Co. v. Knife Co., 897 F. Supp. 1213 (W.D. Ark. 1995); Lebas Fashion Imps. of USA, Inc. v. ITT Hartford Ins. Group, 59 Cal.Rptr.2d 36 (Cal. Ct. App. 1996); B.H. Smith, Inc. v. Zurich Ins. Co., 676 N.E.2d 221 (Ill. App. Ct. 1996) (applying New York Law); Dogloo, Inc. v. Northern Ins. Co., 907 F. Supp. 1383 (C.D. Cal. 1995); Poof Toy Prods. v. U. S. Fid. & Guar. Co., 891 F. Supp. 1228 (E. D. Mich. 1985), rejected by Advance Watch Co. v. Kemper Nat'l Ins. Co., 99 F.3d 795 (6th Cir. 1996) (holding "misappropriation" is limited in meaning to the common-law tort of misappropriation, which does not include trademark infringement). Under the definition of "misappropriation" applied in these cases, "passing off" one's goods as those of another and trademark and trade dress infringement all constitute advertising injury because the offenses involve the wrongful use of marks, packaging, and/or other means by which competitors identify and promote their products to consumers. See 15 U.S.C. § 1127 (defining trademark as "any word, name, symbol, or device" used to distinguish goods from those sold by others and to indicate the source of the goods); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 764 (1992) (defining trade dress as

the overall impression created by a product or its "total image"); Curtis-Universal v. Sheboygan E.M.S., Inc., 43 F.3d 1119, 1124-5 (7th Cir. 1994) (noting that attempt to pass off one's company as a competitor's is "the core trademark infringement" and that "traditional" trademark infringement involves use of a competitor's mark to get sales "unfairly from a competitor by leading consumers to think that the infringer's product or service is of higher quality than it is"). See also Union Ins. Co., 897 F. Supp. at 1216 (citations omitted) (in "ordinary sense" of terms, advertising idea, or "manner by which another advertises its goods or services," includes use of trademark or trade name; in addition, use of mark and name are "integral part" of entity's style of doing business).

The view that "misappropriation of advertising ideas or style of doing business" means only the common-law tort of misappropriation and not trademark or trade dress infringement, first articulated by the Court of Appeals for the Sixth Circuit in Advance Watch, is based on the rationale that the policy language at issue does not specifically list "trademark" in the advertising injury definition. 99 F.3d at 803; see also Sholodge, Inc. v. Travelers Indem. Co., 168 F.3d 256 (6th Cir. 1999) (holding allegation of service mark infringement does not constitute "misappropriation of advertising ideas or style of doing business"). However, this court agrees with decisions of other courts concluding that Advance Watch's approach conflicts with the rule of contract interpretation followed by many state courts, including those of Colorado and Illinois, that the ordinary meaning of policy terms controls. See, e.g., Lebas, supra, 59 Cal. Rptr.2d at 47 n. 14; Am. Employers' Ins. Co. v. DeLorme Publ'g Co., 39 F. Supp.2d 64, 76 (D. Me. 1999); see also Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 747 (3d Cir. 1999) (citations omitted) (noting "Advance Watch has been sharply criticized for ignoring the real contours of

intellectual property law, which often proceeds under a bewildering variety of different labels covering the same material facts"). Accepting the common-law definition of "misappropriation" as one reasonable interpretation of the plain meaning of "misappropriation of style of doing business," it is (at least) equally reasonable to find that it could also mean the wrongful taking of the way another does business or promotes its products. <u>Lebas</u>, 59 Cal. Rptr.2d at 44 (citing <u>Dogloo</u>, 907 F. Supp. at 1388-89). If the phrase is ambiguous, the court must construe it against the drafter and apply the definition favored by the insured. <u>See</u> <u>Fire Ins. Exch.</u>, 953 P.2d at 1301.

Standing alone, the phrase "misappropriation of style of doing business" could encompass a variety of business torts (e.g. trade secret theft and patent infringement) that have little to do with advertising, though advertising could be said to cause or contribute to the ultimate injury. However, as Judge Posner explained in <u>Curtis-Universal,</u> the language should be read in light of the other terms that the policy lists in the definition of advertising injury. <u>See</u> 43 F.3d at 1124. The advertising injury definition in <u>Curtis-Universal</u>, as in this case, listed a wrong that could be interpreted expansively, i.e. unfair competition. The <u>Curtis-Universal</u> court declined to apply the broadest possible interpretation of unfair competition, "everything that has been forbidden by federal antitrust law and then some," finding it

> highly implausible to suppose that "unfair competition" in a list of torts otherwise concerned mainly with harmful speech in various forms (defamation, invasion of the right of privacy, copyright infringement) would sweep under the policy a general, albeit only prima facie, liability for antitrust damages.

43 F.3d at 1123. The court noted that words "sometimes pick[] up meaning from [their] neighbors," and that all of the other terms (piracy, copyright and slogan infringement, defamation, invasion of right of privacy, defamation, etc.) concerned the "misuse of information,

as befits the word 'advertising.'" Id. at 1124. However, it found coverage for claims of tortious interference with contractual relations arising from the insured's dissemination of false information about, and attempts to make consumers believe it was, a competing ambulance service because the claims preserved the "informational connotations" of the traditional legal concept of "unfair competition" and the definition of advertising injury. Id.

The other offenses listed under the "advertising injury" definition in the instant policy, as in Curtis-Universal, are wrongs clearly related to speech or information, such as defamation, disparagement, invasion of the right of privacy, and copyright/slogan infringement, and following Curtis, the court will interpret the term "misappropriation of style of doing business" in light of the terms that surround it. As discussed above, allegations of trademark or trade dress infringement or "passing off" usually come within the meaning of misappropriation of advertising idea or style of doing business because of their informational connotation, but it is important to look beyond the way the allegations are labeled in the underlying complaint because some trade dress or passing off claims involve taking another's product idea and selling it as one's own. See, e.g., Advance Watch, supra, 99 F.3d at 798 (underlying complaint alleged that Advance imitated design and configuration of Cross pen).

Generally, however, "style of doing business" and "advertising idea" should not be interpreted to cover wrongful takings that occur independently of advertising and are merely propagated, compounded, or contributed to by advertising, such as patent infringement or trade secret theft claims. See Winklevoss Consultants, Inc. v. Fed. Ins. Co., 991 F. Supp. 1024, 1034 (N.D. Ill. 1998); see also Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co., 917 P.2d 321, 325 (Colo. Ct. App. 1995) (holding car dealer's generic style of doing business--sales program

violating Uniform Consumer Credit Code--not related to advertising activities was not covered under advertising injury insurance provision); Bank of the West v. Super. Ct., 833 P.2d 545, 559 (Cal. 1992) ("even though the insured advertises the infringing product, if the claim of infringement is based on the sale or importation of the product rather than its advertisement" there is no coverage); Microtec Research, Inc. v. Nationwide Mut. Ins. Co., 40 F.3d 968, 971 (9th Cir. 1994) (no coverage for claims that insured software company "passed off" as its own, computer software created by competitor; wrongdoing was in misappropriating the product, not in advertising it). Cf. Sentex Sys., Inc. v. Hartford Accident & Indem. Co., 93 F.3d 578 (9th Cir. 1996) (upholding coverage where stolen trade secrets consisted of ways to promote or advertise the product).

To ensure that claims labeled "passing off," trade dress infringement, etc., actually allege "advertising" injury ("misappropriation" in the sense related to commercial speech), courts have interpreted the policy definitions in light of the language specifying that the advertising injury must have occurred "in the course of advertising [the insured's] goods or services" to establish a requirement of a causal nexus between the advertising injury and the advertising activity; i.e., the injury for which coverage is sought must be caused by the advertising offense itself rather than by some other wrongful act, and it must result from the "advertising activity" involved rather than from other causes. See Bank of the West, supra, 833 P.2d at 560. The "causation" requirement reflects concerns that "any harm caused by a defective product or service could be covered as 'advertising injury' if the product or service had been advertised in some way," which would go against the parties' reasonable expectations when they entered into the contact. Id. at 560.

To determine whether the offense alleged here occurred "in the course of advertising," the court must attempt to apply the term as it is commonly understood. (The policy does not define advertising.) According to Webster's Collegiate Dictionary (10th ed. 1993), "advertise" means "1. to make something known to: notify; 2.a. to make publicly and generally known; b. to announce publicly especially by a printed notice or a broadcast; c. to call public attention to especially by emphasizing desirable qualities so as to arouse a desire to buy or patronize: promote." See also Black's Law Dictionary (7th ed. 1999) (defining advertising as "the action of drawing the public's attention to something to promote its sale").

An Illinois case noted that "the term 'advertising' has been held to refer to the widespread distribution of promotional material to the public at large." Int'l Ins. Co. v. Florists' Mut. Ins. Co., 559 N.E.2d 7, 10 (Ill. App. Ct. 1990) (holding that an internal organization rule, prescribing conditions for processing floral arrangements that were advertised in a particular way, is not advertising; injury caused by rule did not "arise out of" plaintiff's advertising activity). In defining advertising, that case relied upon a Seventh Circuit decision construing a policy's advertising exclusion. See Playboy Enters. v. St. Paul Fire & Marine Ins. Co., 769 F.2d 425 (7th Cir. 1985). More recently, the Seventh Circuit applied the "plain, ordinary meaning" of the term to find that "[a]ctions taken 'in the course of advertising' must involve actual, affirmative self-promotion of the actor's goods or services." Erie Ins. Group, supra, 102 F.3d at 894. In Winklevoss, Judge Castillo distinguished the Playboy Enterprises definition of advertising, noting that courts read exclusionary clauses narrowly and coverage clauses broadly in light of the general principle of contract construction favoring coverage. 991 F. Supp. at 1031 n. 9 ("The appropriate definition of advertising under Illinois law is by no means a settled issue.")

Under a broad interpretation, a product's label might be considered advertising, as could its packaging. The widespread distribution definition contains no requirement that the thing that draws attention to the product be separate from the product. A number of courts have found that passing off, trademark, trade name or trade dress infringement claims implicitly involve advertising activity, because such claims necessarily involve advertising or use of the mark to identify the insured's goods or services to a substantial number of people. See Peerless Lighting Corp. v. Am. Motorists Ins. Co., 98 Cal.Rptr.2d 753, 765 (Cal. Ct. App. 2000) (citing Dogloo, 907 F. Supp. at 1391); Am. Employers' Ins., supra, 39 F. Supp. at 76; see also Lebas, 59 Cal.Rptr.2d at 41 (trademark infringement "can and often does occur" in course of advertising).

Penney seeks to hold Flodine jointly liable on Ho-Chunk and NAA's claims that it violated the IACA and state law deceptive trade practices when it advertised, marketed, displayed, offered for sale, and sold goods in a manner that falsely suggested they were Indian-made. State Farm contends that its policy covers only advertising activity conducted by Flodine, but the court finds no such restriction in the policy: it provides that the "occurrence" (or "commission of an offense or a series of offenses. . .which results in advertising injury") "must be committed in the course of advertising [Flodine's] goods, products, or services." Policy at 20. The underlying complaint alleges that Ho-Chunk and NAA were harmed when Flodine's goods were advertised and marketed in a way that falsely suggested that the goods were Indian-made. This false suggestion occurred in the course of Penney's public promotion of Flodine's products, which is alleged to have included "advertising" and display in the Penney's catalogue. Even if the court disregards the advertising of Flodine's goods conducted by Penney, it could still find coverage arising from Flodine's advertising activity: attaching tags to goods that presumably

would be distributed to stores and displayed nationwide. The court need not apply the broadest possible definition of advertising to find that Flodine's alleged offenses occurred in the course of advertising her products, because the tags functioned as mini-ads that were tied to the products, clearly promotional in nature yet distinct from the products themselves. See Black's Law Dictionary (6th ed. 1990) (defining advertising to include statements "printed on or contained in any tag or label attached to or accompanying any merchandise").[3]

As for the "causation" requirement or requirement that "misappropriation" be related to commercial speech, an examination of the allegations underlying Penney's claim that Flodine should be held jointly liable if Penney is found to have violated the IACA reveals that this is not a case where the underlying plaintiff is alleging theft of a product or technology; Ho-Chunk and NAA do not challenge the manufacture and sale of "Southwestern-style" arts and crafts. Rather, their complaint concerns the manner in which Penney and Flodine marketed and advertised those products: a manner which created the false impression that the products were authentic, Indian-made goods. In Native American Arts v. Village Originals, the court rejected claims that the IACA regulates the content of crafts or prohibits utilization of "Southwest" designs that resemble Native American design: "to the contrary, IACA does not restrict the artistic quality of [defendant's] merchandise. Rather, it merely regulates the means through which such merchandise is marketed." 25 F. Supp.2d 876, 880 (N.D. Ill. 1998). The court finds that the

---

[3] State Farm points to an unpublished Seventh Circuit opinion containing language that appears to support its position, Westowne Shoes, Inc. v. City Insurance Co., 1996 WL 175084 *4 (7th Cir. April 11, 1996). As an unpublished disposition, Westowne is governed by Circuit Rule 53(b)(2)(iv), which provides that unpublished opinions shall not be cited or used as precedent as State Farm has done. In light of Rule 53, the court does not believe it can appropriately discuss Westowne here except to note that the underlying facts and injury alleged in Westowne were very different from those here.

underlying complaint arguably alleges an injury that occurred in the course of advertising Flodine's products, in the actions of both Penney and Flodine.

Flodine's alleged offenses, the marketing and promotion of products as "authentic Indian-made," reasonably fall within the common meaning of "style of doing business" or "advertising idea." Capitalizing upon the goodwill associated with Indian-made products is a marketing idea concerned with how to persuade consumers to buy certain goods. The wrongful use of these ideas, or ways of marketing "Southwestern style" arts and crafts, are "advertising injuries" under the policy. This conclusion is underscored by the fact that the claims in the underlying complaint are analogous to the kind of claims for trademark or trade dress infringement that fall within the definition of "advertising injury." The IACA contribution claim against Flodine thus falls within the policy's definition of "advertising injury."

The court's analysis of the IACA contribution claims also applies to Penney's claim for contribution from Flodine for its liability to Ho-Chunk/NAA under the Consumer Fraud and Deceptive Trade Practices Acts. The allegations of the underlying complaint assert that Ho-Chunk and NAA lost business as a result of Penney's and Flodine's deceptive trade practice of falsely representing that their goods were Indian-made. The Acts at issue codify common-law unfair competition theories, and the underlying complaint appears to allege that Penney engaged in unfair trade in the nature of passing off or some kind of common-law trademark violation. <u>See</u> <u>William J. Templeman</u>, 735 N.E.2d at 676 (the allegations of the complaint filed against the insured, not the theory under which recovery is sought, determines whether there is a duty to defend). The same alleged conduct underlies both the state statutory claims and the IACA allegations, and the essence of the claims is the same: that Penney (and Flodine) wrongfully

appropriated the marketing advantage of Ho-Chunk/NAA by falsely advertising products as authentic, Indian-made goods. The alleged activities were not merely "false advertising," in the sense that Penney (and Flodine) harmed consumers by deceiving them; they also harmed competitors by using a marketing concept that others had an exclusive right to use. This kind of harm is reasonably included in "misappropriation of the style of doing business." It, like the alleged IACA violations, occurred in the course of advertising Flodine's products.

Having determined that Penney's contribution claims sufficiently allege "advertising injury," the court need not determine whether Ho-Chunk/NAA and/or Penney's claims in their capacities as consumers of Flodine's products (in essence, that they were injured by the alleged falsity of the representation or by purchasing non-authentic goods) allege "advertising injury," because an insurer owes a duty of defense even if only one covered claim is alleged. Curtis-Universal, 43 F.3d at 1122 ("if any of the conduct alleged in the complaint falls within the scope of the insurance policy, the insurer must defend").[4] Unless the underlying claims fall clearly within a policy exclusion, State Farm had a duty to defend Flodine in the Ho-Chunk/NAA/Penney litigation. This duty did not end when Penney's claim for contribution for the IACA violations was dismissed after two and a half months, because Penney's claim for contribution for any liability it faced under Ho-Chunk and NAA's state law claims remained.

## IV. Exclusions

State Farm maintains that three exclusions in the policy operate to bar coverage for any advertising injury offense that is found to have been committed in the course of advertising

---

[4] For the same reason, the court will not address whether the underlying complaint alleged infringement of "title" or slogan.

Flodine's products.

### A. Willful Violation of Penal Statute

According to State Farm, Penney's complaint alleges that Flodine willfully violated the IACA, which State Farm contends is a penal statute. However, the IACA has been held to be a strict liability statute, which requires no proof of intent. See Native Am. Arts, supra, 25 F. Supp.2d at 881. In addition, a finding that this exclusion applied to Penney's claim for contribution from Flodine for its liability under the IACA would not affect State Farm's duty to defend Flodine in the underlying suit because other, non-IACA based claims also triggered coverage.

### B. Arising from Breach of Contract

State Farm's argument that any alleged advertising injury arose from a breach of contract is unavailing. No alleged breach of contract led to the alleged advertising injury in this case (the misappropriation of the style of selling goods as Indian-made). State Farm has it backwards-- while Penney asserted a claim against Flodine for breach of contract, the alleged breach arose out of Flodine's alleged false labeling and misrepresentation of the nature and origin of her goods (the advertising injury), not the other way around. Furthermore, even if this exclusion barred claims for breach of contract, it would not apply to the other claims for which State Farm owes Flodine a duty of defense.

### C. Quality of Goods

Finally, State Farm contends that Flodine's alleged misrepresentation of the nature and origin of her goods falls under the exclusion for injury arising from "the failure of goods, products or services to conform with advertised quality or performance." State Farm asks the

court to read "quality" to mean "attribute," arguing that "the representation that a product is an authentic Native American product is a 'quality' of that product." Def.'s Mot. J. on the Pleadings at 24. If the policy referred to the failure of goods to conform with an advertised quality, or with advertised "qualities or attributes," the court might agree that allegations of false representation regarding a product might be said to concern its failure to conform with whatever attribute or "quality" had been promised. However, the actual exclusionary language indicates failure to conform with advertised "quality or performance." When read in the context of the entire sentence, "quality" has the more specific meaning of "excellence"; this exclusion bars coverage for claims arising from the failure of the insured's products to perform as well as advertised. Though trademarks and/or designations of authenticity can be indicators of quality (in the sense of excellence) to consumers, they are primarily concerned with identifying the source or origin of goods, not how well the goods will perform. The court may not force a strained reading of the clause to create an ambiguity, which in any event would be construed against State Farm. See Crum & Forster, supra, 620 N.E.2d at 1078. The court declines State Farm's invitation to interpret this exclusion generously; the court must read exclusions narrowly to avoid interfering with the insured's expectation of coverage. See Winklevoss, supra, 991 F. Supp. at 1032, n. 9; see also Illinois State Med. Ins. Servs., supra, 629 N.E.2d at 826 (citations omitted) ("Provisions which seek to limit the insurer's liability are construed most strongly against the insurer and in favor of the insured."); Fire Ins. Exch., supra, 953 P.2d at 1301 ("insurer must establish that the exemption claimed applies in particular case and that the exclusions are not subject to any other reasonable interpretation").

## Conclusion

For the foregoing reasons, Defendant State Farm's Motion for Judgment on the Pleadings is denied. The court grants Plaintiff Flodine's Motion for Judgment on the Pleadings on the issue of Defendant State Farm's duty to defend Flodine in the underlying litigation. A status hearing is set for March 15, 2001 at 9:30 a.m.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED:    February 27, 2001